426 So.2d 684 (1982)
Warren BROWN
v.
SOUTHERN FARM BUREAU INSURANCE COMPANY and Aetna Casualty and Surety Company.
No. 82 CA 0307.
Court of Appeal of Louisiana, First Circuit.
December 21, 1982.
Rehearing Denied February 17, 1983.
*686 J. Mark Graham, Houma, for defendant, intervenor and appellant.
Michael P. Pellegrin, Houma, for plaintiff and appellee.
Before LOTTINGER, COLE and CARTER, JJ.
COLE, Judge.
This suit arises from an automobile accident which occurred on January 18, 1980. On this date, plaintiff was driving an eighteen wheel tractor trailer rig which belonged to his employer, Weatherford-Lamb USA, Inc. He was engaged in the course and scope of his employment as a truck driver. As plaintiff proceeded towards Houma on Highway 90 in Terrebonne Parish, Louisiana he was hit by a pickup truck driven by Dennis E. Wilhite, who was killed in the accident. Plaintiff also suffered personal injuries in the accident which form the subject matter of the present suit. It is undisputed that the wreck resulted from the negligence of decedent Wilhite.
On April 11, 1980, plaintiff filed suit against Southern Farm Bureau Insurance Company (later properly designated as Louisiana Farm Bureau Mutual Insurance Company) as insurer of Dennis E. Wilhite. Since the Farm Bureau policy limit for liability was only $5,000, suit was also filed against Aetna Life & Casualty Insurance Company (later properly designated as Aetna Casualty and Surety Company) as uninsured motorist carrier covering the vehicle which plaintiff was driving at the time of the accident. Aetna filed a third-party demand against the succession of Wilhite and his insurer, Louisiana Farm Bureau. Aetna, in its capacity as workers' compensation insurer of plaintiff's employer, also filed a petition of intervention seeking recovery of amounts which it had paid and was paying to plaintiff under the Louisiana Workers' Compensation Act.
Prior to trial, all demands against Louisiana Farm Bureau and its insured, Dennis Wilhite, were compromised and settled and those claims were dismissed. On August 17, 1981, the case went to trial on the remaining claims of plaintiff against Aetna as uninsured motorist carrier; and on the intervention claims of Aetna as workers' compensation carrier. After trial on the merits, the trial court found the plaintiff to be insured under the uninsured motorist policy and awarded him $817,365.26 for past and future lost wages and benefits and an additional $150,000 for pain and suffering. The trial court also refused Aetna's claim for reimbursement of its compensation payments and dismissed the intervention.
From this adverse judgment, Aetna has appealed. Aetna's specification of alleged errors by the trial court follows:
1. The trial court awarded an excessive amount of damages.
2. The trial court erred in awarding interest from the date of judicial demand rather than from the date of judgment.
3. The trial court erred in failing to limit any recovery, including interest, to the limits of the uninsured motorist coverage available under the policy.
4. The trial court erred in refusing Aetna's claim for reimbursement of workers' compensation benefits from the proceeds of the uninsured motorist insurance available.
5. The trial court erred in failing to reduce any amount payable under the uninsured motorist coverage by sums paid or payable under workers' compensation and social security disability benefits.

QUANTUM
Plaintiff sustained a serious injury to his low back. This aggravated a pre-existing condition of spinal stenosis which was completely asymptomatic prior to the accident. Plaintiff initially was brought to see Dr. Thomas Haydel, whose preliminary diagnosis was that plaintiff had suffered a cervical and lumbar strain. Over the next few weeks, however, plaintiff's condition deteriorated to the point where he was referred to Dr. Richard Landry, an orthopedic surgeon. Dr. Landry first saw plaintiff on February 20, 1980, at which time he observed narrowed disc spaces between several *687 of plaintiff's vertebrae. Dr. Landry treated this condition for about four weeks with physical therapy. On March 19, 1980, with plaintiff's condition still deteriorating, a myelogram was performed which revealed a bulging disc at the L3-4 location. At this point, plaintiff was suffering from acute headaches, limited motion in the neck, acute low back pain, and numbness and inability to move the lower extremities.
On April 24, 1980, Dr. Landry performed a bilateral laminectomy between L3 and L4. A large facet joint as well as the lamina between L3 and L4 on the left and right side were removed. Additionally, a second incision was made in plaintiff's left hip area from which bone was removed to perform a fusion of plaintiff's spine between L3 and L4 to increase the spine's stability. It became apparent to Dr. Landry during this surgery that the combination of the bulging disc with the spinal stenosis was responsible for pressure on plaintiff's nerve roots which caused plaintiff's low back pain and extremity numbness and weakness.
Following the surgery, plaintiff's physical activities were severely limited. He was instructed to avoid sitting for a period of six to eight weeks, to wear a steel brace at all times except when sleeping, to walk as much as possible, and to avoid therapeutic stress to the spine in order that the fusion could become solid. However, X-rays taken in August 1980 indicated the fusion had failed to solidify. Therefore, plaintiff was forced to undergo a second fusion surgery on January 7, 1981 which was substantially similar to the first, except this time a bone graft was taken from the right hip. This second surgery was successful, though plaintiff's physical activities remain limited. Plaintiff continues to suffer headaches, stiffness in the neck, occasional swelling of the low back, occasional numbness of the lower extremities, acute depression, insomnia due to pain, poor appetite, and nervousness.
Plaintiff was forty years old at the time of the accident. He is married and is the father of five minor children who are dependent upon him for support, along with three of his wife's minor children who also live with them. Plaintiff has only a sixth grade education and a background of manual labor. An industrial psychologist who examined and tested plaintiff found he has below average intelligence and poor manual dexterity. Dr. Landry testified plaintiff's physical impairment precludes him from performing any work which would require lifting over thirty-five pounds, or any persistent bending, stooping, squatting, or prolonged standing or sitting. From this testimony, the trial court concluded plaintiff is permanently disabled and will never be able to find any work except for minimum wage jobs.
At trial, plaintiff called Dr. Seymour Goodman to testify as an expert economic witness regarding plaintiff's lost wages and benefits. The total lost wages and benefits, past and future, were calculated to be $817,365.26. The portion of this figure for the future lost wages ($693,442.50) was reached by projecting a total annual increase in salary of 8.57 percent, which was compounded annually over plaintiff's 21.8 year work life expectancy at the time of the trial and then discounted to present value at a rate of seven and one-quarter percent. This projected increase was based upon annual inflation rate of 5.36 percent and a 3.31 percent annual productivity increase.
The essence of appellant's argument on appeal is that the productivity increase used in the projections was unsupported by the facts of the case. Appellant argues plaintiff was already working an average of almost eighty hours per week, and for the trial court to presume that his productivity could increase was unrealistic.
We believe the productivity rate was not unjustified by the facts. The 3.31 percent rate of annual increase in productivity was based on the actual experience of male truck drivers in Louisiana over the past twenty years. This rate reflects not only the measure of the individual's capacity but also the demand conditions for the industry as a whole. Dr. Goodman also applied a negative .25 percent per annum factor to plaintiff's projected productivity over the *688 remainder of his work life expectancy to compensate for the fact that in actual experience a person in the truck driving industry experiences a decline in productivity after reaching a certain age. Finally, as a matter of fact, plaintiff's wages had increased by 17.6 percent per annum in the three years before the accident. Even assuming that ten percent of this was due to the high rate of inflation at that time, plaintiff's income had increased by 7.6 percent due to productivity alone. We therefore reject appellant's argument that the productivity rate should not have been included. See Hardy v. State, Through Dept. of Highways, 412 So.2d 208 (La.App. 3d Cir.1982) writ denied, 414 So.2d 305, 381 (La.1982) (2.8 percent per year production increase factor used in calculating future lost wages of car salesman).
While triers of fact are not bound to follow the opinion testimony of expert witnesses, Smith v. Andrepont, 378 So.2d 479 (La.App. 1st Cir.1979), writ refused, 380 So.2d 102 (La.1980), mathematical projections of future earnings may be used as one of the guides employed by courts in computing an award for loss of future income. Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370 (La.App. 1st Cir.1974). Although the trial court awarded the amount projected by Dr. Goodman, it did so because it felt his projections were conservative and any lesser award would amount to an abuse of its discretion. The trial court noted the 5.36 percent annual rate of inflation projected was a very conservative figure, for over the last ten years inflation has averaged nine percent per annum. Dr. Goodman's projections also included an assumption that plaintiff would be able to return to some kind of work by September 1, 1981 at the rate of $4.00 per hour and thereafter receive increases equal to the increase in the minimum wage. Again, the trial court found such assumptions to be conservative, since Dr. Landry testified plaintiff could not return to work before early in 1982. Also, Dr. Craig Feldbaum, the industrial psychologist who examined plaintiff, testified plaintiff would only be able to find minimum wage jobs at best.
The trial court rejected testimony of Mr. Michael Theriot of Weatherford-Lamb to the effect they would provide plaintiff with a $5.00 per hour cleanup job when he was able to return to work. Though Mr. Theriot claimed the job had been in existence for over one and one-half years, the job was not listed in a document labeled "Wage and Promotion Policy for Hourly Employees of Weatherford International, Inc.," which supposedly listed all hourly employee jobs available at Weatherford-Lamb. The trial court found even if such a job existed, plaintiff's physical condition would prevent him from performing such work. We find no manifest error in these factual determinations.
We note finally that Aetna produced no expert economists to give testimony of their own for the court to weigh against that of Dr. Goodman. Thus, Dr. Goodman's opinion evidence was the only evidence on the issue of lost wages which the trial court had before it, and the trial court felt the defendants were unable to discredit his testimony. We therefore conclude the record substantiates the trial court did not abuse its "much discretion" in awarding $817,365.26 in lost wages and benefits. La.Civ. Code art. 1934(3); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Nor can we say this same discretion was abused in the award of $150,000.00 for plaintiff's pain, suffering, and disability. This amount is based upon the testimony outlined above concerning plaintiff's physical complaints. The trial court considered the cases of McDonald v. South Central Bell Tel. Co., 377 So.2d 1044 (La.App. 4th Cir.1979); Daigle v. Long, 377 So.2d 1384 (La.App. 4th Cir.1979) writ denied, 381 So.2d 510 (La.1980); Johnson v. Wicks, 356 So.2d 469 (La.App. 1st Cir.1977); and Huval v. Sinitiere, 376 So.2d 548 (La.App. 3d Cir.1979); all of which awarded amounts for pain and suffering ranging from $100,000 to $165,000, and found plaintiff's injuries were worse than those discussed in these cases. We therefore affirm the trial court's determination of quantum.

*689 INTEREST
Aetna also contends the trial court erred in awarding interest from the date of judicial demand rather than from the date of the judgment. Although the trial court's award was consistent with a prior decision of this Court in Hebert v. Ordoyne, 388 So.2d 407 (La.App. 1st Cir.1980), which awarded interest from the date of judicial demand, Aetna relies upon a Third Circuit case to the contrary, Guidroz v. Tauzin, 413 So.2d 682 (La.App. 3d Cir.1982).[1] In Guidroz, our brethren on the Third Circuit held that since the plaintiff's action against his uninsured motorist carrier was one in contract, according to Booth v. Fireman's Fund Insurance Company, 253 La. 521, 218 So.2d 580 (1968), then interest is recoverable only from the time the debt becomes due under the terms of La.Civ.Code art. 1938. The Guidroz court concluded the uninsured motorist carrier's debt becomes due at the time of the judgment, since its obligation to perform under the terms of the policy did not arise until there was a legal determination of the liability of the uninsured motorist and the extent of plaintiff's damages.
We respectfully disagree with the decision in Guidroz and adhere to our prior opinion in Hebert v. Ordoyne, supra. The damages sought by plaintiff in his petition and awarded by the trial court were delictual damages, having arisen from an automobile accident. La.R.S. 13:4203 provides as follows:
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto,' which may be rendered by any of the courts."
The language of this statute is mandatory; damages resulting from negligent conduct automatically include interest thereon from the date of judicial demand as a matter of public policy. La.R.S. 13:4203 does not speak in terms of causes of action, rather, it speaks in terms of judgments sounding in delictual damages. The scheme of uninsured motorist protection is designed to provide the innocent insured with a source of recovery for delictual damages sustained as a result of the negligence of an uninsured or underinsured motorist. Although the cause of action against an uninsured motorist carrier arises in contract, as held in Booth, supra, it is not inconsistent to require the carrier to pay delictual damages including interest thereon as mandated by La.R.S. 13:4203, inasmuch as there is nothing contra bonos mores involved in contracting to pay delictual damages. If there was, such coverage as involved here would be prohibited by law, not encouraged by it.
Furthermore, to award interest from the date of the judgment would violate the minimum statutory limit requirement of the uninsured motorist statute. La.R.S. 22:1406(D)(1)(a) prohibits the issuance of an automobile liability insurance policy in Louisiana unless it affords uninsured motorist coverage up to the amount of the policy limits for bodily injury liability, though the insured may reject the coverage or select lower limits in writing. The purpose of this statute is to place the innocent victim of an uninsured or underinsured motorist in the same position as if the tortfeasor had liability coverage. See Williams v. Buckelew, 246 So.2d 58 (La.App. 2d Cir.1970). When a liability insurer is held liable, it must pay on behalf of its insured not only the principal policy limits, but also legal interest thereon from the date of judicial demand until paid. See O'Donnell v. Fidelity General Ins. Co., 344 So.2d 91 (La.App. 2d Cir.1977), and cases cited therein. Any policy provision which attempts to limit the liability insurer's liability for legal interest from the date of judicial demand contravenes the public policy of La.R.S. 13:4203 and cannot be enforced. See O'Donnell, supra. Since uninsured motorist coverage is supposed to provide the same coverage as liability insurance, then these same rules should likewise apply to uninsured motorist insurance. Otherwise, the plaintiff who recovers under uninsured motorist insurance will receive less compensation than another plaintiff who recovers under liability insurance. We *690 therefore affirm the award of legal interest from the date of judicial demand.[2]
Appellant also contends the trial court erred in refusing to limit the total recovery, including interest, to the limits of the uninsured motorist coverage available under the policy. This contention is without merit. Since we have already concluded La.R.S. 13:4203 to be applicable to judgments for uninsured motorist insurance proceeds, the UM insurer is liable not only for judgments up to the principal policy limits, but also for legal interest on the amount of the judgment from the date of judicial demand until paid. La.R.S. 13:4203 is a mandatory provision and prevails over any policy provision to the contrary. See O'Donnell, supra, and cases cited therein.

REIMBURSEMENT OF WORKERS' COMPENSATION BENEFITS
Aetna next contends the trial court erred in dismissing its intervention in the capacity of workers' compensation insurer to recover the compensation benefits from the proceeds of the uninsured motorist insurance. This issue was decided recently by the Louisiana Supreme Court in Johnson v. Fireman's Fund Insurance Company, 413 So.2d 906 (La.1982), in an opinion which reversed in part the court of appeal decision at 411 So.2d 538. In Johnson, the Supreme Court rejected prior appellate court decisions in Lute v. City of Lake Charles, 394 So.2d 736 (La.App. 3d Cir.1981); Bannon v. Edrington, 392 So.2d 186 (La.App. 4th Cir. 1980); and Gentry v. Pugh, 362 So.2d 1154 (La.App. 2d Cir.1978), writ refused, 363 So.2d 922 (La.1978).
The Gentry case held that the uninsured motorist carrier is not the type of "third person" from whom the workers' compensation insurer can recover its compensation benefits under La.R.S. 23:1101 when an employee is injured by a third party tortfeasor. The "third person" referred to in La.R.S. 23:1101 is defined as "some person" in whom a "legal liability to pay damages" is created by a compensable injury or sickness. The Bannon case reasoned such a "legal liability" is one imposed by law rather than by a contract. Since the uninsured motorist carrier's obligation to pay arises by contract, the Bannon court concluded its liability is not a "legal liability to pay damages" within the meaning of La.R.S. 23:1101.
In reviewing these decisions, the Supreme Court in Johnson stated "these rationales represent an unduly restrictive interpretation of the phrases `third person' and `legally liable to pay damages' as they are contemplated in La.R.S. 23:1101." That statute, as seen by the Supreme Court,
"... was not designed to restrict the employer's right of reimbursement to recover from the tortfeasor. Rather, the thrust of the provision is to prevent double-recovery and to eventually allocate the loss to the tortfeasor.... We therefore see no reason to limit applicability of the employer's right of action strictly to the liability of a tortfeasor, as distinguished from the liability of an uninsured motorist insurer or a liability carrier whose obligation to pay damages under the statute is contingent upon a determination of the legal liability of a tortfeasor."
The Supreme Court thus concluded:
"An uninsured motorist carrier is a third person legally liable to pay damages to an injured employee protected by its coverage because it is obliged by law and the issuance of its policy to repair the same damage which the tortfeasor has caused and to guarantee recovery as if the tortfeasor had been insured. Therefore, a worker compensation insurer can recover amounts paid to an injured employee out of uninsured motorist coverage. La.R.S. 23:1101. However, this is subject to one limitation. Worker compensation insurers cannot recover out of uninsured motorist coverage paid for by an employee because the worker compensation statute prohibits direct or indirect imposition of *691 the cost of compensation upon an employee. La.R.S. 23:1163."
Applying this new rule to the facts of the instant case, we must conclude the trial court erred in dismissing Aetna's intervention in its capacity as workers' compensation insurer, since the uninsured motorist coverage at issue here was purchased by plaintiff's employer, not by the plaintiffemployee himself.
Because we conclude Aetna is entitled to reimbursement of its compensation benefits paid from the proceeds of the uninsured motorist insurance, we need not address Aetna's final assignment of error, which concerned the trial court's refusal to allow, according to policy provisions, a credit to the amount of uninsured motorist insurance for workers' compensation and social security disability benefits paid. Aside from the fact that such a credit has been uniformly denied by the other circuit appellate courts,[3] an award of such a credit here would result in the employee's recovery under his uninsured motorist coverage being reduced by twice the amount of compensation he has been paid. Even Aetna has recognized the inequity in such a situation and has thus sought either reimbursement of compensation paid or a credit to the amount of uninsured motorist proceeds due, but not both.
For the above reasons, the judgment of the trial court dismissing Aetna's intervention as plaintiff's workers' compensation insurer is reversed. The trial court's judgment is affirmed in all other respects. Plaintiff is therefore entitled to $967,365.26 in uninsured motorist insurance proceeds, plus interest from the date of judicial demand, less any compensation benefits already paid by Aetna in its capacity as workers' compensation insurer. Appellant is to pay all costs.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
ON APPLICATION FOR REHEARING
PER CURIAM.
Plaintiff-appellee has applied for a rehearing seeking modification of our opinion rendered following original hearing on appeal. As correctly pointed out by plaintiff-appellee our opinion should have recognized his right to the principal sum of $979,447.59 in uninsured motorist insurance proceeds, the heretofore stated amount of $967,365.26 being in error due to our failure to include medical expenses of $12,082.33. Unlike the awards for lost wages and for pain and suffering, the medical expenses were not at issue on appeal and we inadvertently failed to include them in our computation. Accordingly, we modify our original opinion to provide that plaintiff-appellee is entitled to $979,447.59 in uninsured motorist insurance proceeds, plus interest from the date of judicial demand, less any compensation benefits already paid by Aetna in its capacity as workers' compensation insurer. As modified, our original opinion is affirmed.
REHEARING DENIED.
NOTES
[1] See also, Horstmann v. Drake, 420 So.2d 473 (La.App. 4th Cir.1982); and, Powell v. Allstate Insurance Company, 233 So.2d 38 (La.App. 2d Cir.1970).
[2] Consistent with our reasoning and result is the rationale of Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La.1982). Since the tort-feasor and uninsured motorist carrier are bound in solido, it would be inconsistent for their interest obligations to vary.
[3] Gagnard v. Thibodeaux, 336 So.2d 1069 (La. App. 4th Cir.1976); Landry v. State Farm Mutual Automobile Insurance Company, 320 So.2d 254 (La.App. 3d Cir.1975); Williams v. Buckelew, 246 So.2d 58 (La.App. 2d Cir.1970), overruling Allen v. United States Fidelity and Guaranty Co., 188 So.2d 741 (La.App. 2d Cir.1966).